A. SINGH

    Q.    Did you transfer text messages?

    A.    Yes.

    Q.    Mr. Singh, besides this litigation, are you involved in any other litigation?

    A.    No.

        MR. WALIA:  Objection.

        Asked and answered.

        You can answer.

        You can answer the question.

        (Indicating.)

        THE WITNESS:  No.

        MR. KADOCHNIKOV:  I think you're a little muted, so if you could speak up, you're hard to hear.

        MR. WALIA:  Sure, I will come closer to the mic.  Thank you.

        MR. KADOCHNIKOV:  Thank you.

    Q.    Have you ever been involved in any other litigation, besides this one?

    A.    No.

    Q.    Mr. Singh, what is your highest level of education?

    A.    Just one year of college.

Page 11

A. SINGH

Q.    Which college did you go to?

A.    Queensborough Community College.

Q.    And when did you attend that college?

A.    I don't remember.  I don't remember.  It's been a while.

Q.    Is it more than ten years ago?

A.    It is definitely more than ten years ago.

Q.    Besides attending college, do you have any professional certificates or anything of that nature?

A.    No.

Q.    Are you presently employed?

A.    Yes.

Q.    Where do you work?

A.    In Hicksville.

Q.    Doing what?

A.    In a restaurant.

I work in a restaurant.

Q.    What is the name of the restaurant?

A.    Chicken & Rice NY.

Page 12

A. SINGH

Q.    What is the address of Chicken & Rice NY?

A.    495 South Broadway, Hicksville, New York 10801.

Q.    What is your position in Chicken & Rice NY?

A.    I own the store.

Q.    What kind of a business is Chicken & Rice NY?

A.    It's a Mediterranean restaurant.

Q.    When I'm saying, what kind of business, I mean, is it an LLC, is it a Corporation?

A.    It's -- I'm sure it's an LLC.

Q.    What is the full name of the LLC?

A.    It's Bros Chicken and Rice Inc.

Q.    Repeat that.

A.    Bros, B-R-O-S, Chicken and Rice Inc.

Q.    Bros?

A.    Yes.

Q.    So Bros Chicken and Rice Inc?

Page 13

                         A. SINGH

A.      Yes.

Q.      And is that an ampersand or the spelled out and?

A.      Spelled out.

Q.      Spelled out?  Do you own this business with anybody?

A.      Yes, I have a partner.

Q.      What is the name of your partner?

A.      Noddy, N-O-D-D-Y, Singh.

Q.      The Noddy Singh that you are referring to, is that your brother, Noddy Singh?

A.      Yes, my brother, Noddy Singh.

Q.      And what is the stake of your partnership?

A.      50/50.

Q.      Are you both shareholders?

A.      Yes.

Q.      Does your brother, Noddy Singh, work there as well?

A.      Yes.

Q.      What kind of work do you do for Bros Chicken and Rice Inc?

Page 18

A. SINGH

know how else I can clarify a mischaracterization.

MR. KADOCHNIKOV:  If there is any way I'm mischaracterizing his testimony, you can say that it's a mischaracterization, but when you're objecting to just an answer, then it's a problem.

MR. WALIA:  Well, I'm simply pointing out what he already testified to; so it's not a suggestion of an answer that is not already on the record.

So I'm not sure what you're insinuating, so -- (Indicating.)

The only thing I did was rehash the record which speaks for itself.

Over objection, he can answer.

MR. KADOCHNIKOV:  Read that back, please, read it back.

(Whereupon, the referred to question and answer was read back by the Reporter.)

MR. WALIA:  Objection.

Page 19

                    A. SINGH

          You can answer the question.

     A.    I know he was working in
Dunkin' Donuts.

     Q.    Do you know if he is still
employed in Dunkin' Donuts?

     A.    I'm not sure.

     Q.    Do you know what his position
in Dunkin' Donuts is?

     A.    I believe he is a supervisor;
from what I understand.

     Q.    What is the reason that you
believe that?

     A.    Just past talk.
          He did not go into details.

     Q.    Sorry, I did not hear the
answer.

          MR. KADOCHNIKOV:  Read that
     back, please, the answer.

          (Whereupon, the referred to
     answer was read back by the
     Reporter.)

     Q.    Mr. Singh, if you could speak
up just a little bit or move in closer to
the mic.  I have a hard time hearing you.

Page 20

A. SINGH

I will try to increase the volume on my end as well.

A.    No problem.

Is this better?  (Indicating.)

Q.    Yes.  Thank you.

A.    No problem.

Q.    Now, is anybody, besides yourself and your brother, employed in Bros Chicken and Rice Inc?

A.    I have an employee.

Q.    When were they hired?

A.    A month ago.

Q.    What do those eight employees do?

A.    Not eight.  I have one.

Q.    One?

A.    One.

Q.    Sorry.

A.    Actually, I'm going to go with the number, so -- this way we stay clear.

Q.    All right.

A.    So I have one full-time employee.

Q.    All right?

                        A. SINGH

     A.    A month ago.

     Q.    All right?

     A.    And there is another part-time employee, I hired two weeks ago; so I have two employees altogether.

     Q.    All right.  So you have one full-time, one part-time?

     A.    Yes.

     Q.    All right.  What does the full-time employee do?

     A.    So they both cook.

     Q.    All right.  Now, what were the startup costs associated with opening NY Chicken & Rice?

     A.    NY Chicken & Rice?

          MR. WALIA:  Sorry?  What?

     Q.    The startup costs associated with opening NY Chicken & Rice?

          MR. WALIA:  NY Chicken & Rice?
          I don't believe he mentioned
       NY Chicken & Rice.

          MR. KADOCHNIKOV:  You're right, counselor.  You are right.  Sorry.

     Q.    Bros Chicken and Rice.

Page 22

A. SINGH

MR. WALIA:  All right, go ahead.

A.    (No response.)

MR. WALIA:  You may answer the question, Mr. Singh.

A.    Costs around 175; 165, 175.

Q.    What is the source of the funds?

A.    We work, so -- (indicating).
We had money from -- you know, some loan; so, funds we had, that's where we get it.

Q.    You just said you had some money from a loan, who is the loan from?

A.    From our bank.

Q.    Which bank is that?

A.    Bank of America.

Q.    What is the amount of loan?

A.    I'm not sure right now.

Q.    Okay.

A.    I'm unclear on how much the loan was.

Q.    Who took out the loan?
By whom, I mean, is it a

Page 46

                              A. SINGH

Q.    Were you shared with a draft, before it was presented to Pratik Patel?

A.    No.

Q.    When was the first time you saw it?

A.    When we were all going to -- we all sat at the table to see this paperwork, and that's when I saw it with myself, Noddy and Pratik.

Q.    The first time it was shown to you was at the table, when you sat down at the table?

A.    That is correct.

Q.    And where did that take place?

A.    This happened at a restaurant, Delhi 6.

Q.    Was it signed at Delhi 6 as well?

A.    Not the same day.

Q.    When was it signed?

A.    This was signed after Pratik showed the paper to his attorney and he brought it back; I believe -- somewhere in October, if I'm correct -- of 2017?

Page 47

A. SINGH

Q. Do you know which attorney he showed it to?

A. He did not disclose.

Q. Did you speak to any attorney regarding this contract?

A. No.

Q. Did you speak to anybody besides your brother and Pratik regarding this contract?

A. No.

Q. I'm going to read a sentence into the record; Pratik Patel agrees to put down a retainer of 25,000.

Do you know what is meant by, a retainer?

A. Initial payment to start.

Q. So was that an investment?

A. He basically -- it was -- it was an investment, yeah.

Q. And you said that you were looking for a working partner for the location, correct?

A. Yes.

Q. Was the salary with Pratik

Page 48

A. SINGH

Patel discussed, before the contract was signed?

A.    No, nobody brought it up.

Q.    Was the salary discussed, after this contract was signed?

A.    I mean, there was some talks; that was it.

Q.    Talks from whom?

A.    From all of us.  Because we were all going to be working so we all spoke?

Q.    When did you speak your thoughts about salaries?

A.    I think, right around opening time in November 2017.

Q.    Was any salaries agreed to?

A.    Only Pratik's; that was it.

Q.    What was agreed to?

A.    I believe we started -- he wanted 550, then it went up to 600.

Q.    Sorry, did you say started with 550?

A.    550, and then went to 600.

Plus, he was collecting tips

Page 49

A. SINGH

also.

Q.    And 550, that's, what, a week?

A.    That's correct.

Q.    All right.  Now, when did Pratik start working in the business as a working partner?

A.    When the store opened. November 2017, end of November; if I'm not mistaken.

Q.    What was the amount of hours he was working, when the store opened in November?

A.    It wasn't -- it was maybe 30, 35, 40 hours, I would say, max.

Q.    Did the amount of hours Pratik was working from, 30 to 35 to 40 max, did that ever increase?

A.    Yeah, an hour or two here and there.

Q.    No, no.  The question was; did the amount of hours Pratik worked ever increase from 30, 35, 40 hours?

A.    Yeah, it went up, four, five, six hours, yup.

Page 50

A. SINGH

Q. Sorry, what did you say?

I did not catch the last part the amount of hours.

A. Yes. Six to seven hours, it went up, when the store opened up, yes.

Q. And when do you think that took place?

A. I think that happened by next year.

Q. By, next year, you mean, 2018?

A. 2018 is correct, yes.

Q. Do you think it happened in January of 2018, some time later?

A. Definitely later. Around summertime; I would say, around June, July.

Q. You said that when Pratik started working, he was getting $550 a week, right?

A. Yes.

Q. How was he drawing that salary?

A. Mostly cash.

Q. When you are saying, mostly cash, was there a time when he took a check?

A. SINGH

Q.  When you're saying, amount of sales, do you mean, let's say, amount of sales in the quarter, or like the dollar amount of sales?

A.  Dollar amount for the quarter.

Q.  So would it be both the amount of sales and the dollar amount for the quarter?

A.  (No response.)

Q.  For example, 100 sales and $1,000, for example, something like that.

A.  No, it would not give you the number of customers or number of people you covered to make that dollar.

That would be a daily to weekly report if you wanted to check.

But if you wanted to do like a monthly or quarterly check, it would limit all of those numbers.

And it would only give you the dollar amount without the head count.

Q.  Okay, I understand.

Thank you for clarifying that.

A.  No problem.

**Page 74**

A. SINGH

THE WITNESS:  Can I request two, three-minutes break?  I have to check, if you don't mind, I'm at work, please?

MR. KADOCHNIKOV:  Yes, yes, no problem.  Would you like to take ten minutes?

THE WITNESS:  Just five minutes, tops.

MR. WALIA:  Is that fine?

If everybody's okay with five minutes, that's fine.

MR. KADOCHNIKOV:  I'm fine.

MR. WALIA:  So at 12:05; see you then.

MR. KADOCHNIKOV:  Yes.

(Whereupon, a short recess was taken.)

EXAMINATION CONTINUED BY MR. KADOCHNIKOV:

MR. KADOCHNIKOV:  Read that back, please.

(Whereupon, the referred to question and answer was read back by

Page 75

A. SINGH

the Reporter.)

Q.      Now, Mr. Singh, when did Pan King, Inc. close its doors?

A.      I think, March of -- end of February or March, the first week of 2021.

Q.      2021?

A.      Yes.

Q.      And when did Pratik Patel depart the business?

A.      He was gone somewhere in 2019.

Q.      Pratik Patel left in 2019?

A.      I believe it was 2019 that he left, yeah.

Q.      Did Pan King, Inc. receive any P.P.E. loans?

A.      While Pratik was there?

Q.      No.  At all?

A.      Yes, it did receive P.P.E.

Q.      What was the amount?

A.      7,000-something.  It wasn't much because the business was a loss, so -- (Indicating.)  We didn't have that many employees.

Q.      Did Pan King, Inc. apply for

Page 76

A. SINGH

any SBA loans, such as the EIDL loan?

A.    Hello?

Q.    Did you hear the question?

A.    Can you say it again.

Q.    Did Pan King, Inc. apply for
any SBA loans; such as an SBA, EIDL loan?

A.    Yes, we did.

Q.    Was Pan King, Inc. approved for
that loan?

A.    We are still awaiting response
for one of them.

Q.    For one of them?

A.    Yes.

Q.    Was there any SBA loans that
Pan King, Inc. was approved for?

A.    Yeah, it's approved, but we are
waiting, still waiting, on the final
answer.

MR. WALIA:  You're talking
about Pan King, Inc., right?

MR. KADOCHNIKOV:  Yes.

MR. WALIA:  I want to be sure
you're speaking about Pan King, Inc.
with respect to the SBA loan.

**Page 110**

A. SINGH

Q.    Okay.  Let's see.

These are the check images drawn, correct?  (Indicating.)

A.    Yes.

Q.    The number of check is 1675.

A.    Okay.

Q.    The checks that are written, check number 1675, in the amount of $100,000, it shows it as a withdrawal.

So what exactly is your testimony with regard to this check?

A.    What exactly do you want me to say?  Because -- I just told you -- the $100,000, we put in the business that we opened up.

Q.    Which business did you open up?

A.    Chicken & Rice NY.

Q.    Pan King, Inc.?

A.    So this is -- the money actually is a loan into the account.  The money is a loan under our name.  It's not under Pan King, Inc.

It was an SBA loan that needs to be returned; as you know.

A. SINGH

Q.    The SBA loan was received under your name?

A.    No.  The -- it was received under the company's name.  If the money was deposited inside the company, it came to the company.

Q.    Why was there a company check, written from Pan King, Inc. to Arjun Singh, in the amount of $100,000, on August 10, 2020?

A.    Because -- we were leaving, and we had to -- you know, get started with something new, I guess.

But Pratik was not there to consult with anything or give any kind of advice or any input; so, luckily, we got the SBA loan, and we had to move on.

Q.    Where was this money deposited into; this 100,000?

A.    It was deposited into another bank account.

Q.    Right.

What is the bank account?

Belonging to who?

A. SINGH

A.    Belong to the corporation.

Q.    Which corporation?

A.    Bros Chicken and Rice.

Q.    Which corporation?

A.    Bros Chicken and Rice.

Q.    Why was a loan, that was intended for Pan King, Inc., deposited into Bros Chicken and Rice?

A.    Because nobody was there.

The lease was gone.

Pratik was gone.

We could not get another lease.

The lease was under Pratik's name.

Q.    Did the company remain open, after the lease was done?

A.    I mean, listen, it was almost going to be closed, we only had three, four month lease left.

Q.    Was the company ever dissolved?

A.    No, not yet.

Q.    You have vacated the premises, the lease premises, 8 Jerusalem Avenue, on March 2020, the loan was given to you in

**Page 113**

A. SINGH

August 2020.

        A.    Okay?  We still have to give the money -- I cannot close the company -- because we owe money to the SBA.

            MR. WALIA:  By counsel, 8 Jerusalem Avenue would be part of the expansion; he previously testified he vacated that in February or March 2021.  Furthermore --

            MR. KADOCHNIKOV:  Correct.

            I stand corrected.

            MR. WALIA:  Furthermore, the leeway in this line of questioning I have given you, if you can look at your own complaint that you filed and the allegations contained in that complaint, this has nothing to do with what occurred almost eight months prior when your client left.

            If anything, this is by and between the SBA and this witness and whoever else took that loan; so I'm not sure, what, if anything, you are asking.

**Page 114**

A. SINGH

MR. KADOCHNIKOV:  Counsel, that's your argument.

MR. WALIA:  Well, you can enlighten me on what you're looking at.  Your complaint and the causes of action contained in there, what this SBA loan -- which was taken almost eight months after your client left -- has anything to do with the litigation you filed?

MR. KADOCHNIKOV:  That would be breach of fiduciary duty.

MR. WALIA:  A breach of fiduciary duty?

MR. KADOCHNIKOV:  Yes.

MR. WALIA:  All right, okay?

But that breach of fiduciary duty, did not concern your client in any way.  It happened eight months after the fact.

MR. KADOCHNIKOV:  That's your argument.

MR. WALIA:  All right.

If there was any such breach of

A. SINGH

fiduciary duty, the loan, as he said, has to be repaid.

Q. All right. So which bank accounts was this check, check number 1675, deposited in to?

A. What do you mean?

The name of the bank?

The company?

I said I have given you these names, three times.

Q. Let's start with the name of the bank.

A. Bank of America.

Q. Okay. Bank of America.

And it belongs to Bros -- what was the name of the company -- Bros Chicken and Rice?

A. It doesn't belong to Bros Chicken and Rice. It's a loan. Is does not belong -- it only belongs to --

Q. I'm talking about the account, Mr. Singh, who does the account belong to?

A. The account belongs to Bros Chicken and Rice.

A. SINGH

Q.    All right.  And is that bank account still open?

A.    Yes.

MR. KADOCHNIKOV:  I call for production of bank records for the account belonging to Bros Chicken and Rice from August 2020 and up to and including today.

I will make that demand in writing.  I don't have any further questions.

MR. WALIA:  All right, I'm putting my objection for the record with respect to any documents pertaining to Bros Chicken and Rice.

I don't think an adequate connection has been made, even given the allegations of breach of fiduciary duty, as alleged by counsel.

Because it happened well after the fact and does not concern his client.

This is clearly a fishing