Noddy Singh

that corporation, in Delhi 6?

     A.     Arjun Singh.

     Q.     What was Arjun Singh's ownership stake?

     A.     50 percent.

     Q.     So, it was 50 percent you, and 50 percent your brother, Arjun Singh?

     A.     That's correct.

     Q.     Arjun Singh is your brother, correct?

     A.     Yes.

     Q.     You said it was closed around September, October of 2017?

     A.     That's correct.

     Q.     What was the reason why it was closed?

     A.     The overheads were getting too expensive for us to operate the business.

     Q.     What was the location of Delhi 6?

     A.     Hicksville.

     Q.     Do you have an address?

     A.     46 West Old Country Road, Hicksville, New York 11801.

Noddy Singh

Q.    When you were saying that the overhead became too expensive, can you elaborate on that?

What constituted the overhead?

A.    The minimum wage went up.  The rent was going up every year.  Minimum wage went up.  It was a pretty big place to operate over the time, just to -- the sit down restaurant industry wasn't that profitable at that time.

Q.    How many people did Delhi 6 employ at the time of closing?

A.    About seven.

Q.    Does that include you and Arjun Singh?

A.    Yes.

Q.    What was the last rent at 46 West Old Country Road?

A.    $11,330, I believe.

Q.    What was the approximate monthly payroll for Delhi 6?

A.    Somewhere around 20s.

Q.    Around $20,000?

A.    Yeah, give or take, $20,000.  It

Noddy Singh

was actually $26,000 or $25,000.

MR. WALIA:  Just reminding counsel this litigation is not based upon his dealings at the corporation for which he was a 50 percent shareholder of Delhi 6.  It's for a different corporation.  I'm giving you some leeway, but I'm going to start objecting to this line of questioning as irrelevant.

MR. KADOCHNIKOV:  I understand. Rule 26 permits pretty wide discovery. Unless, I'm going into something that's really inappropriate, you really have no basis to object.

MR. WALIA:  I'm letting you know what our position is and that's why I'm giving you some leeway.  I'm allowing you to ask some questions. I'm waiting to see the connection.

Q.    Mr. Singh, when was the first time you met Mr. Pratik Patel?

A.    The first time I met Pratik was somewhere in July 2017.

Noddy Singh

Q.    What were the circumstances under which you met Mr. Pratik Patel?

A.    I had met his brother a few times before.  They were looking for a business venture to get into and they proposed something to do with the food business.  And, you know, at that time we were looking at something into the Mediterranean industry, like a fast food restaurant, that's how he came across.

MR. WALIA:  Please, answer only the question that he's asking.

Thank you.

THE WITNESS:  Sure.

Q.    You said that you met his brother, Lalit Patel, before that; is that correct?

A.    Yes.

Q.    When did you first meet his brother, Lalit Patel?

A.    I met Lalit in June 2017.

Q.    What were the circumstances under which you met Mr. Lalit?

A.    He was a customer at the

Noddy Singh

restaurant, Delhi 6.

Q.    How did the conversation between you two begin?

A.    They came as a customer.  They liked the food.  They liked the place.  They approached me.  They introduced themselves.  And that was the first meeting.

Q.    When you were saying "they," who do you mean?

A.    He came with his friend, Lalit, and another person, Verma.

Q.    Was there anybody else present for the June 2017 conversation?

A.    No.

Q.    It was just you, Lalit, and Verma?

A.    Yes.

Q.    Was there any conversation about starting a business that took place on June 2017 meeting?

A.    No.

Q.    Was another meeting scheduled?

A.    No, it wasn't scheduled.

Page 25

Noddy Singh

Q.      How did the second meeting occur?

A.      They came again the next week or so, you know, again, just for dinner.  You know, they came, they liked the place. Again, we started talking.  Then, they approached me for how they were looking -- Lalit was looking to get into the food business, you know, trying to get some numbers.  Just casual talks.

Q.      When did the first business related conversation take place?

A.      The second time when we met, Lalit was interested in.  Like I said, he was interested in the business venture. He wanted to inquire what does it cost to open a restaurant to get into food business.  Like I said, they were looking into something in the food business, and I gave them a rough estimate of 150, $200,000 investment.  That's how the conversation started.

Q.      This was around June or, maybe, July of 2017?

Page 26

Noddy Singh

A.    This was June 2017.  Yes.

Q.    Who was present for the second meeting; was it --

A.    Again, it was Verma and Lalit.

MR. WALIA:  Wait for him to finish, please.

THE WITNESS:  Sure.

Q.    Was the third meeting scheduled at the second meeting?

A.    The third meeting was scheduled at the second meeting.  They wanted to see more.  They were more curious about the cuisine, about the food, and Lalit had wanted to try the food and say, you know, can we try the food and see what kind of concept it is.  So, the third meeting they did try the food.  We had a small food tasting.  Lalit and Pratik came together.

Q.    That third meeting, when did it take place?

A.    This was probably somewhere in July.

Q.    July of 2017?

A.    Yes.

Page 27

Noddy Singh

Q. Besides trying the food, what else was discussed at that meeting in July 2017?

A. I mean, the concept was discussed. Mediterranean concept. Halal concept. Investment was discussed. They were more curious about the location.

Q. When you say "concept," was discussed?

What was exactly discussed?

A. What it cost to open a food business or fast food restaurant. How much does it cost, basic things.

Q. At the time of the third meeting, did you have an estimate of the cost that it would cost to open the fast food restaurant?

A. Just from the top of my head.

Q. What were the numbers given off the top of your head?

A. Around $150,000, $200,000.

Q. Was there a breakdown to the $150,000 to $200,000 cost?

A. Not -- we didn't discuss that at

Page 28

Noddy Singh

that time.

Q.    Did there come a time when breakdown was discussed?

A.    I mean, buying a restaurant, key money, renovating, lease, attorney, just basic costs.  Because I'm in the field, so, I know, what basic costs occur to open a restaurant.

Q.    Did I cut you off?

A.    No.  Go ahead.

Q.    You mentioned that location was discussed.

Was it any particular location that was discussed?

A.    We were looking at Hicksville. Hicksville is a prime location.  We were looking at Hicksville.

Q.    When you were saying that "we were looking at Hicksville," who do you mean by that?

A.    I mean, we were discussing Hicksville.  Because Hicksville is the prime hub, train station is here.  The mall is here.  The crowd basically is

Page 29

Noddy Singh

here.

Q.    What I'm asking is that when you're saying "we were discussing Hicksville," who constitutes the "we?"

A.    I mean, it was a casual conversation.  They were talking, I was talking.  That's how we came to a mutual understanding that Hicksville is a good location.

Q.    Who was present at the third meeting?

A.    Lalit, Pratik, and I.

Q.    Your brother wasn't there?

A.    My brother, no.  I don't recall him there.

Q.    Before you met Lalit and Pratik, were you and your brother considering the Hicksville location?

A.    No, we were not.

Q.    So, how did it come about that this particular location was considered?

A.    This location was considered because I happen to find this location that the seller wanted to sell.  The rent

Noddy Singh

was very low compared to market.  I guess, the seller wasn't making money or he wasn't surviving.  They were asking for $120,000.  I negotiated the deal down.  Like I said, the rent was so low that it was worth a shot.

MR. WALIA:  Mr. Singh, as a reminder, please, answer the question he's asking.

Thank you.

Q.    How did you know the seller?

A.    I found him on Craig's List.

Q.    Was there an advertisement for the sale of business on Craig's List?

A.    Yes.

Q.    Do you remember the sum and substance of that advertisement?

A.    I'm sorry, sum and substance?

Q.    Yes.  What did the ad say?

A.    It said business, restaurant business for sale.  100 something thousand dollars, prime location, next to the train station.

Q.    At the time that you came across

Noddy Singh

that advertisement, were you looking to get into the restaurant business or were you just browsing?

A.    I was just browsing.

Q.    When did the fourth meeting take place?

A.    After the food tasting in July. Again, they were more interested in the concept now after they tasted the food. They were impressed.  Now, they wanted to come up with serious numbers and work out what it's going to cost.  Can they be part of it.  You know, how we going to move forward with the deal.

Q.    Who was present for the July 2017 meeting?

A.    July 2017 meeting was Lalit and Pratik again.

Q.    That's the fourth meeting we're talking about, right?

A.    Yes.

Q.    Your brother wasn't there?

A.    I mean, most of the meetings happened at the restaurant so he might

Noddy Singh

have been there, but I don't recall.

Q.    Do you remember the numbers that were discussed at the fourth meeting?

A.    $50,000, 25 percent shareholder in the company for the Chicken & Rice.

Q.    What else was discussed besides the numbers?

A.    The location was discussed. That was about it.

Q.    What else besides location?

A.    That was pretty much it.

Q.    Were the shareholders' responsibilities discussed?

A.    No.  It wasn't discussed.

Q.    Did there come a time when the shareholders' responsibilities were discussed?

A.    There was a time where the shareholder responsibilities were discussed and we were responsible for the setup, you know, bringing the place to life, and recipes.  Pretty much everything to do with the business.  And Pratik was responsible to work minimum of 48 hours.

Noddy Singh

Q.    When was the first time that shareholder responsibilities were discussed?

A.    This was at about a fourth meeting that we had when they wanted to move forward and I had started looking for this location.  We were in talks of negotiating with the seller, you know, with the terms.

Q.    Are you sure it was the fourth; because I'm not saying that you are incorrect or anything, but you just said that the things that were discussed at the fourth meeting were numbers, and locations, and responsibilities were discussed later?

MR. WALIA:  Objection.

A.    That was the third meeting.

MR. WALIA:  Objection to the characterization.  His testimony stands for whatever he stated, but if you want to ask a direct question, if you can rephrase, please, go ahead.

MR. KADOCHNIKOV:  Are you

Noddy Singh

instructing him not to answer?

MR. WALIA:  I'm instructing you to ask an appropriate question without the mischaracterization or the rehashing of his testimony.

MR. KADOCHNIKOV:  Okay.

Q.    When was the first time that responsibilities were discussed?

A.    When the -- financially, when they gave us a retainer of $25,000, they wanted something written, and, you know, the agreement, the shareholder agreement, was given to them to review.

Q.    When was that?

A.    That was some time in September.

MR. WALIA:  That was, of course, September of 2017?

THE WITNESS:  September 2017, that is correct.

MR. WALIA:  Thank you.

Q.    Let me share a document with you.  Give me one second.

A.    Sure.

Q.    Can you see my screen?

Noddy Singh

A.     Yes, I can.

Q.     If you need me to increase, or decrease the font, or scroll down, just let me know.

MR. KADOCHNIKOV:  I have this marked as Exhibit 5.

(Whereupon, Plaintiff's Exhibit 5, shareholder agreement was marked, for identification, as of this date.)

MR. WALIA:  For what, exactly?

MR. KADOCHNIKOV:  For plaintiff.

THE REPORTER:  Was this previously marked?

MR. KADOCHNIKOV:  Just mark it. When I say I have it marked, I have it marked in my spreadsheet.  I'll be going a little bit out of order.

Q.     Mr. Singh, if you need me to scroll up and down, or increase, or decrease font, just let me know.

A.     Sure.

Q.     Have you seen this document before?

A.     Yes, I have.

Page 36

Noddy Singh

Q.    What can you identify this document as?

A.    This was, basically, a document and agreement between us as a shareholder agreement.  You know, when they gave us the retainer, $25,000, they wanted something in writing that they would be becoming part of the shareholder agreement and it's written pretty clear that Pratik was 25 percent shareholder for $50,000 investment.

Q.    Who made this document?

A.    I did.

Q.    Where did you make this document; I mean, was it on your computer at home, was it somewhere else?

A.    No, it was on my computer.

Q.    It was your computer?

A.    Yes.

Q.    Did you consult with anybody before you were making this document?

A.    No, I did not.

Q.    Did you speak to an accountant about it?

Noddy Singh

A.    No, I did not.

Q.    Did you speak to an attorney about it?

A.    No, I did not.

Q.    Do you see where it says Pratik Patel agrees to put down a retainer of $25,000?

A.    Yes.

Q.    Could you elaborate what you mean by a retainer?

A.    I mean, moving forward, we needed some surety that, okay, we will be shareholders and we will be part of, you know, this agreement.  So, the retainer was $25,000, so, we can move forward with the negotiating of the new venture, new store.

Q.    Was this $25,000 meant to be an investment or something else?

A.    It was an investment for 25 percent shareholder.

Q.    When you're saying $25,000 toward the location in Hicksville for the franchise of NY Chicken & Rice, what do

Noddy Singh

you mean by a franchise?

A.     At that time they wanted something in writing that they were giving us $25,000 moving forward with the Chicken & Rice concept, with the halal concept. So, it was pretty much clear that they will put down 25 -- $50,000 for 25 percent stake in the company.

Q.     Was there ever a franchise registered?

A.     No.

Q.     Let's move on down a little bit.

Do you see where it says Pratik will be working a minimum of 48 hours per week?

A.     Yes.

Q.     Was Pratik's salary ever discussed?

A.     Pratik's salary was discussed, yes.

Q.     Was it before signing or after signing of this contract?

A.     It was after signing the contract.

Noddy Singh

Q.    What was the salary that was agreed to?

A.    Initially, when we started, Pratik was drawing $550 a week, because we had just opened the business.  For the first six to eight weeks he was getting $550, then, we increased it a little after mutual understanding, and he was drawing $600 per week.

Q.    When you were saying that, initially, he was drawing $550 a week?

A.    Yes.

Q.    When was that, that initial period?

A.    December, when we opened.

Q.    December of what year?

A.    2017.

Q.    So, Pratik was getting salary from the moment that Pan King opened, correct?

A.    That's correct.

Q.    How was Pratik drawing a salary; in what manner?

A.    Cash.  Mostly, it was cash.

Noddy Singh

Sometimes when the company didn't have enough cash, he would draw a check, also.

Q.   Were there records kept for the salary that Pratik drew?

A.   There were some records kept, yes.

Q.   Did you turn over those records to your attorney?

A.   Yes, I did.

MR. KADOCHNIKOV:  I call for production of whatever salary records were turned over.

MR. WALIA:  We don't have any salary records.  So, I'm going to ask the witness to turn over whatever records he has, then, we will forward the same.

MR. KADOCHNIKOV:  Could you speak up a little bit?

MR. WALIA:  Yes.

We do not have any salary records given to us at this moment in time.  So, I'm going to ask the witness to turn over the salary

**Page 41**

Noddy Singh

records, so, we can produce them to plaintiff's counsel.

MR. KADOCHNIKOV:  Thank you.

Q.    At some point, Pratik's salary changed from $550 to something else; is that correct?

A.    That's correct.

Q.    What did it change to?

A.    $600 a week.

Q.    When did that happen?

A.    February 2018.

Q.    How was that salary drawn in February 2018?

A.    Cash as well.

Q.    Do you have records for that as well?

A.    Somewhat, yes.

Q.    What do you mean by "somewhat?"

A.    Pratik was in charge of handling cash, and since his investment was cash, you know, he wanted to, you know, repay whoever he got the funds from.  That was the reason why he was drawing cash.  It was discussed that he will be responsible

Noddy Singh for his own taxes.

MR. KADOCHNIKOV:  Counsel, let's take a five-minute break.

MR. WALIA:  Sure.

(Whereupon, a recess was taken at this time.)

Q.    Mr. Singh, we're still on Exhibit 5, the contract.

A.    Yes.

Q.    Between December 2017 and February 2018, what were Pratik Patel's working hours?

A.    He was covering the first shift, which was from 10:00 to 4:00, 10:00 to 5:00.

Q.    How many days a week?

A.    Six days a week.

Q.    So, 10:00 to 4:00, 10:00 to 5:00?

A.    Yes, sir.

MR. WALIA:  Al, sorry to interrupt, before there was mention about documents pertaining to payroll records, then, the witness stated

Noddy Singh

that, perhaps, there were no payroll records because the salary was taken in cash. And you made a demand for production from us for payroll records. So, if you could clarify what exactly are the payroll records this witness has regarding Pratik Patel's employment?

MR. KADOCHNIKOV: We'll get to it a little later.

MR. WALIA: When you make that demand, I have to respond. I just want to be sure.

MR. KADOCHNIKOV: I'll put the demand in writing anyway.

MR. WALIA: What I'm saying, as far as this witness is concerned, I don't want to say anything. I would like to know what exactly are the payroll records he has.

MR. KADOCHNIKOV: I get it. I'll make a demand in writing for whatever follows up.

MR. WALIA: Thank you.

Page 44

Noddy Singh

Q.    Mr. Pratik Patel was covering the first shift, 10:00 to 4:00, 10:00 to 5:00.

Did his working hours ever change, Mr. Pratik Patel's working hours?

A.    He had freedom of moving his hours around if he wanted.  There wasn't a hard rule for that.

Q.    What was the amount of hours he was working on average any given week?

A.    About 48 hours.

Q.    Between December 2017 he was getting paid about $550 a week cash, starting from February 2018, he was getting about $600 a week cash.

Did that ever change?

Did his salary increase or decrease at some point from $600 a week?

A.    No.

Q.    When did Pratik Patel leave the business?

A.    He left in February 2020, I believe.

Q.    Between February 2018 and

Noddy Singh

February 2020 he was getting paid about $600 a week; is that correct?

A.   He was getting $600, plus, tips that were coming in.

Q.   What would you say was the amount of weekly tips on the average?

A.   50, 60 bucks.

Q.   Ballpark, about $650 a week all together?

A.   That's correct.

Q.   Mr. Singh, do you see the portion of Exhibit 5 that I'm highlighting?

A.   Yes.

Q.   Could you read that into the record, please?

A.   "Stealing of theft will void or default this partnership and Pratik will lose his investment if found guilty by the law official."

Q.   Was there ever any allegation of stealing or theft?

A.   Not that I recall, no.

Q.   Do you see this next paragraph

Page 46

Noddy Singh

that I'm highlighting on Exhibit 5?

A.    Yes.

Q.    Could you read that into the record, please?

A.    "If defaulted, Pratik or his future partner will pay a fine of $250,000."

Q.    Are the events of default described anywhere within this contract?

A.    Yes.  The minimum of 48 hours a week that he's required to work, which he defaulted on a few times.

He went to India in 2019, I believe, for some property dispute.  That was told by -- Pratik told us that.  Then, in February, when he left the company, he was supposed to come back, which he never did, and there are no phone calls, there were no messages for the next five months or so.

Q.    Are there any other events of default described in this contract?

A.    Not really, no.

Q.    How did you come up with the

Page 130

Noddy Singh

less than a year, but almost a year.

Q.    What was the last thing you spoke to him about?

A.    Probably closing Pan King.  That we're not in business anymore.  For the tax purposes he must have called and --

Q.    Did he close the corporation for you?

A.    No, he did not.

Q.    Did you take any steps to close the corporation?

A.    Not yet.

Q.    Did Harvinder Dhody ask you to provide any documents that would allow him to close the corporation?

A.    No, he did not.

Q.    What was the sum and substance of your conversation with Mr. Dhody about closing the corporation?

A.    Just the time that we were in business, January, February, he wanted to file taxes, payroll tax and sales tax. Whatever was backed up with Pan King, we wanted to resolve that.

Page 131

Noddy Singh

Q.     When Pratik Patel started working with Pan King, Inc, what were his responsibilities?

A.     Pratik, he wasn't from the food industry.  We basically had to train, you know, him through the whole process.  His responsibility was managing the store, taking care of the customers, cashing out, closing sales.

Q.     When you were saying managing the store, what does that entail?

A.     Hand to hand operation.  Dealing with the customers.  Making sure food quality is good.  Basic things that you need in a restaurant.  Fast food, I would say.

Q.     When you're saying cashing out, what do you mean?

A.     I mean, he would close the sales.  Keep track of the money.  You open the sales, the register has to be a certain amount, when you close the sale, register has to be cashed out, how much cash came in.

**Page 132**

Noddy Singh

Q.    Was he doing that every day?

A.    Yes, he was doing that every day.

Q.    Was he reporting to somebody every day regarding cashing out and closing sales?

A.    Not every day, but he was the one keeping track of the sales.  It wasn't required to report every day.  It could be a week until he had the receipts that Monday was X amount, Tuesday was X amount.

Q.    Did Mr. Patel make any managerial decisions with regard to the running of Pan King, Inc?

A.    He had a free hand from our side.  Whatever authority we had, he had. He wasn't restricted to any --

MR. WALIA:  Hold on.

You're talking about Pratik Patel; is that right?

MR. KADOCHNIKOV:  Yes, Pratik Patel.

A.    Pratik had all access.  He has access to the statement, the bank account,

Noddy Singh

delivery companies, the cash in business. The register, he had the master password. Everything was accessible.  We didn't hold him back from anything.

Q.    Did he have authority to hire and fire employees?

A.    Yes, he did.

Q.    Did he have authority to set salaries for employees?

A.    Yes, he did.

Q.    Did he have to consult with either you or Mr. Arjun Singh before he would set a salary for an employee?

A.    It wasn't necessary, but whatever best judgement, he can use.

Q.    What were your responsibilities when it came to running Pan King?

A.    Basically, we build the whole place.  We build the whole setup.  We made the changes.  We renovated the place, bring it to life.  The recipes were ours. We were making the mixes and making the sauces.  Pratik had no idea about how the recipes were made, the sauces, what we

Noddy Singh

were making.  The vendors we all chose.
The negotiation for the lease, basically,
pretty much everything we handled to bring
the business to a standing position.

Q.    Did you work in the store at all
in the restaurant?

A.    Yes, I did.  I was covering the
days that the guys were off.  When Pratik
was off, I was covering.  I was covering
when the grill man was off.

Q.    How many days a week would you
say that was?

A.    I was putting in a good 30
something hours.

Q.    What were your hours of work?

A.    Like I said, the days Pratik was
off, I was there.  Me and Arjun, we would
handle the shifts that were needed
covering for the guys that are off.  Like
Carlos was off, Arjun was covering him.
Pratik was off, I was covering.  Plus, we
got delivery from Restaurant Depot, we
made the ordering list, we made the
spices, we made the mix, we made the

Noddy Singh

sauces.

Q.    Would that be the same for your brother, Arjun, as well; did he have the same responsibilities as you did?

A.    He knew how to make the recipes and stuff.  Yeah, he had the same responsibilities, plus, more, not less.

Q.    How did Arjun responsibilities differ from yours?

A.    He was handling a little bit of the tax side, also.  He would know better. As far as running the ship, he was there more than me.  He was covering the store, the employees, more than me.

Q.    About how many hours a week would you say Arjun worked?

A.    I wouldn't know.

Q.    Did there come a time when a second location was opened?

A.    Not with Pan King, no.

Q.    What did you mean by that?

A.    The second location had nothing to do with Pan King.

Q.    What was the name of the second

**Page 136**

                    Noddy Singh

location?

     A.     The Halal Chicken & Rice Company.

     Q.     When was that open?

     A.     I believe, December 2020.

     Q.     What's the name of the corporation under which Halal Chicken & Rice Company operates?

     A.     Which one?  Pan King?

     Q.     No, Halal Chicken & Rice, the second location?

     A.     1023 Chicken Factory.

     Q.     Is that inc., corp, or something else?

     A.     I believe, it's an LLC, I believe.

     Q.     Does the restaurant known as Halal Chicken & Rice Company still exist today?

     A.     No, it does not.

     Q.     When was it closed?

     A.     It's closed a few months ago.

     Q.     Who were the members of 1023 Chicken Factory, LLC?