Page 101

A. SINGH

I don't know what this is.

Q.    Okay, that's fine.

I'll stop the share.

(Counsel Complies.)

MR. KADOCHNIKOV:  All right.

Let's take five minutes.

I may be about done.

MR. WALIA:  All right.

MR. KADOCHNIKOV:  Let's take a five-minute break.

MR. WALIA:  All right.

(Whereupon, a short recess was taken.)

EXAMINATION CONTINUED BY

MR. KADOCHNIKOV:

Q.    Let's continue.

Let me show another exhibit to you, this was just shared with me recently, so I actually don't know anything about it.

MR. KADOCHNIKOV:  Thank you, counsel, by the way.

I will send you everything, all the text messages in my possession.

I just got a couple of zip

A. SINGH

files.

So let's mark this as Exhibit 25 today.

(Whereupon, the aforementioned handwritten ledger was marked as Plaintiffs' Exhibit 25 for identification as of this date by the Reporter.)

Q.    I'll share.

(Counsel Complies.)

Now, Mr. Singh, are you familiar with the document that I put up on my screen as Exhibit 25 marked today?

A.    Yes.

Q.    Can I tell me what that is?

A.    These are all the amount and the check numbers that Pratik took.

Q.    That Pratik took?

A.    That was given to Pratik by the company or that Pratik took.

Q.    And when was this ledger created?

A.    That was -- I should have provided yesterday.

A. SINGH

Q.    No, no, when was it created?

A.    Two days ago?

Took me almost like a day-and-a-half, it took me a day-and-a-half besides my working hours.

So, on my break, I would sit down and -- jot down whatever I could, going through the checkbook.

Q.    All right.  Now, Mr. Singh, is it your testimony that you are unaware that any EIDL loan was approved yet, or not?

A.    No, I said there is one in review.

Q.    Sorry?

A.    There is one in review.

There is -- we did get an EIDL loan, sir, yes, we did; but there is one in review.

Q.    What is the amount of the EIDL loan that you received?

A.    It was 120.

Q.    And when was that loan received?

A.    I think it's right around the

A. SINGH

time that -- right before -- or around the
time we closed doors for Pan King.

Q.    120; is that 120,000?

A.    120,000, yes.

Q.    And what were the proceeds of
the loan used for?

A.    Back taxes, gas bills,
electric, pay employees; any of the bills,
any miscellaneous, anything that was left
over.

Q.    Was there any checks written to
any partners from the proceeds of the EIDL
loan?

A.    As in -- a lump sum amount?

Q.    Any amount.

A.    I mean -- we used some money,
left over money, to -- you know, open the
restaurant; that's about it?

Q.    Sorry, what was the answer?

A.    I -- I didn't really -- I think
there was a few hundred dollars that we
took as a -- on salary from that amount.

Q.    Were there any checks from the
proceeds of the EIDL loan written to

A. SINGH

shareholders?

A.    Not that I remember, sir?

Q.    Okay.

A.    Not that I recall.

Q.    Were there any checks written to you?

A.    I'm not sure about this answer. I [SIC] got to look into it?

Q.    Sitting here right now, were there any checks written to you?

A.    No, not from -- not from Pan King, no.

Q.    Were there any checks written to Noddy, Noddy Singh?

A.    I don't know, sir.

Q.    Let me share a different document with you.

MR. KADOCHNIKOV:  Let's mark this as Exhibit 27.

(Whereupon, the aforementioned bank statement was marked as Plaintiffs' Exhibit 27 for identification as of this date by the Reporter.)

A. SINGH

Q. I'll share.

(Counsel Complies.)

Can you see my screen?

A. No.

Q. Sorry about that.

Can you see my screen now?

A. Yes.

Q. Okay. Now, do you recognize the document marked today as Plaintiffs' Exhibit 27?

A. (No response.)

Q. I'll represent to you it's a bank statement from Bank of America for Pan King, Inc.

A. Okay.

Q. Would you agree with that?

A. Yeah.

Q. All right. So it appears -- give me one second -- do you see where I'm highlighting on-line bank transfer in SAV 4207 in the amount of 100,000?

A. Okay.

Q. What does SAV 4207 stand for?

A. (Indicating.)

A. SINGH

Q.    If you know.

A.    The screen is moving up and down?  Are you moving it?

Q.    Yes, I am.  I'm moving it.

Okay, I'll stop.

So SAV 4207?

A.    I think this is one of the businesses that we opened for the restaurant here; if I'm not mistaken.

Q.    And there's a transfer of $100,000 into the checking account, correct?

A.    Yes.

Q.    All right.  Would it be fair to say that a portion of that transfer, constitutes the proceeds from the EIDL loan?

A.    Yes.

Q.    Let me show you a copy of the check, I'll increase the screen, that has been written out, on August 10, 2020.

(Counsel Complies.)

Now, do you see a copy of that check?

A.    (Indicating.)

                    A. SINGH

Q.    Yes?

A.    Yes.

Q.    Who is that check written out to?

A.    It says -- I went to the bank -- to the bank account.

Q.    Which check did that check go to?

A.    The one that we just opened, the restaurant.

Q.    The one that you just opened, the restaurant?

A.    Yes, that's right, yes.

Q.    Which restaurant did you open?

A.    The Chicken & Rice NY.

Q.    Do you see the date of this check?

A.    Yes.

Q.    What is the date of that check?

A.    8/10/2020.

Q.    It appears that this is a check written from Pan King, Inc., correct?

A.    Yes.

Q.    Who is the check written to?

A. SINGH

A.    Arjun Singh.

Q.    What is the amount of the check?

A.    100,000.

Q.    So can you explain why Pan King, Inc. writes you a $100,000 check?

A.    This is a loan.

That's the loan that the government gave everybody.

Q.    It's the check from Pan King, Inc. to you?

A.    Yes.  That's the one I had to deposit in the bank.

It's not money from Pan King.

It's the loan that was granted.

This money, we [SIC] got to pay back to the government.

Q.    Are you saying that a copy of this check, that is written out to you, is a copy of a check that was deposited?

A.    This was a same check deposited to the bank.  This is not inside my personal bank.  It went to the bank that we associate the business with.

A. SINGH

Q.    Okay.  Let's see.

These are the check images drawn, correct?  (Indicating.)

A.    Yes.

Q.    The number of check is 1675.

A.    Okay.

Q.    The checks that are written, check number 1675, in the amount of $100,000, it shows it as a withdrawal.

So what exactly is your testimony with regard to this check?

A.    What exactly do you want me to say?  Because -- I just told you -- the $100,000, we put in the business that we opened up.

Q.    Which business did you open up?

A.    Chicken & Rice NY.

Q.    Pan King, Inc.?

A.    So this is -- the money actually is a loan into the account.  The money is a loan under our name.  It's not under Pan King, Inc.

It was an SBA loan that needs to be returned; as you know.

Page 111

A. SINGH

Q.     The SBA loan was received under your name?

A.     No.  The -- it was received under the company's name.  If the money was deposited inside the company, it came to the company.

Q.     Why was there a company check, written from Pan King, Inc. to Arjun Singh, in the amount of $100,000, on August 10, 2020?

A.     Because -- we were leaving, and we had to -- you know, get started with something new, I guess.

But Pratik was not there to consult with anything or give any kind of advice or any input; so, luckily, we got the SBA loan, and we had to move on.

Q.     Where was this money deposited into; this 100,000?

A.     It was deposited into another bank account.

Q.     Right.

What is the bank account?

Belonging to who?

A. SINGH

A.    Belong to the corporation.

Q.    Which corporation?

A.    Bros Chicken and Rice.

Q.    Which corporation?

A.    Bros Chicken and Rice.

Q.    Why was a loan, that was intended for Pan King, Inc., deposited into Bros Chicken and Rice?

A.    Because nobody was there.

The lease was gone.

Pratik was gone.

We could not get another lease.

The lease was under Pratik's name.

Q.    Did the company remain open, after the lease was done?

A.    I mean, listen, it was almost going to be closed, we only had three, four month lease left.

Q.    Was the company ever dissolved?

A.    No, not yet.

Q.    You have vacated the premises, the lease premises, 8 Jerusalem Avenue, on March 2020, the loan was given to you in

A. SINGH

August 2020.

A.    Okay?  We still have to give the money -- I cannot close the company -- because we owe money to the SBA.

MR. WALIA:  By counsel, 8 Jerusalem Avenue would be part of the expansion; he previously testified he vacated that in February or March 2021.  Furthermore --

MR. KADOCHNIKOV:  Correct.

I stand corrected.

MR. WALIA:  Furthermore, the leeway in this line of questioning I have given you, if you can look at your own complaint that you filed and the allegations contained in that complaint, this has nothing to do with what occurred almost eight months prior when your client left.

If anything, this is by and between the SBA and this witness and whoever else took that loan; so I'm not sure, what, if anything, you are asking.

Page 114

                    A. SINGH

MR. KADOCHNIKOV:  Counsel, that's your argument.

MR. WALIA:  Well, you can enlighten me on what you're looking at.  Your complaint and the causes of action contained in there, what this SBA loan -- which was taken almost eight months after your client left -- has anything to do with the litigation you filed?

MR. KADOCHNIKOV:  That would be breach of fiduciary duty.

MR. WALIA:  A breach of fiduciary duty?

MR. KADOCHNIKOV:  Yes.

MR. WALIA:  All right, okay?

But that breach of fiduciary duty, did not concern your client in any way.  It happened eight months after the fact.

MR. KADOCHNIKOV:  That's your argument.

MR. WALIA:  All right.

If there was any such breach of

**Page 115**

A. SINGH

fiduciary duty, the loan, as he said, has to be repaid.

Q.    All right.  So which bank accounts was this check, check number 1675, deposited in to?

A.    What do you mean?

The name of the bank?

The company?

I said I have given you these names, three times.

Q.    Let's start with the name of the bank.

A.    Bank of America.

Q.    Okay.  Bank of America.

And it belongs to Bros -- what was the name of the company -- Bros Chicken and Rice?

A.    It doesn't belong to Bros Chicken and Rice.  It's a loan.  Is does not belong -- it only belongs to --

Q.    I'm talking about the account, Mr. Singh, who does the account belong to?

A.    The account belongs to Bros Chicken and Rice.

**Page 116**

A. SINGH

Q.    All right.  And is that bank account still open?

A.    Yes.

MR. KADOCHNIKOV:  I call for production of bank records for the account belonging to Bros Chicken and Rice from August 2020 and up to and including today.

I will make that demand in writing.  I don't have any further questions.

MR. WALIA:  All right, I'm putting my objection for the record with respect to any documents pertaining to Bros Chicken and Rice.

I don't think an adequate connection has been made, even given the allegations of breach of fiduciary duty, as alleged by counsel.

Because it happened well after the fact and does not concern his client.

This is clearly a fishing

**Page 117**

A. SINGH

expedition.

In any event, it is a loan which has to be repaid.

And that is our position.

That's it.  Nothing further.

MR. KADOCHNIKOV:  Exhibit 26 is a UCC financing statement, so there is no need to mark it.

So just Exhibits 25 and 27 marked today.

(Whereupon, at 1:21 P.M., the Examination of this Witness was concluded.)

                    _____
                         ARJUN SINGH

Subscribed and sworn to before me this _____ day of _____ 20___.

_____
    NOTARY PUBLIC